UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| FRANCISCO RIVERA-MUÑIZ; VALERIE DAPENA-DISDIER; the conjugal partenrship constituted by them, on their own behalf; and on behalf of all others similarly situated<br><br>Plaintiffs,<br><br>         v.<br><br>HORIZON LINES, INC.; HORIZON LINES, LLC; HORIZON LOGISTICS, LLC; HORIZON LINES OF PUERTO RICO INC.; SEA STAR LINES, LLC; CROWLEY MARITIME CORPORATION; CROWLEY LINER SERVICES, INC.; TRAILER BRIDGE, INC.; SALTCHUK RESOURCES, INC.; PETER BACI; ALEXANDER G. CHISHOLM; R. KEVIN GILL; GREGORY GLOVA; GABRIEL SERRA and LEONARD SHAPIRO<br><br>Defendants, | CIVIL NO. 09-2081<br><br><br><br><br>JURY TRIAL DEMANDED |

**CLASS ACTION COMPLAINT**

**TO THE HONORABLE COURT:**

**COME NOW** Plaintiffs, on their own behalf, and on behalf of the class members made up by all other consumers in Puerto Rico found under identical or similar circumstances, in light of the facts that follow, bring this action for damages against defendants, under the antitrust laws of the United States of America, demanding a jury trial, alleging as follows:

## **NATURE OF THE CASE**

1.    On or about May 2002, and at least until April 2008, Defendants Horizon Lines, Inc.; Horizon Lines, LLC; Horizon Logistics, LLC; Horizon Lines of Puerto Rico, Inc.; Sea Star Lines, LLC; Crowley Maritime Corporation; Crowley Liner Services, Inc.; Trailer Bridge, Inc.; Saltchuk Resources, Inc.; Peter Baci; Alexander G. Chisholm; R. Keving Gill; Gregory Glova; Gabriel Serra; and Leonard Shapiro entered into and engaged in a combination and conspiracy to suppress and eliminate competition in the market for coastal water freight transportation services between the United Stated and Puerto Rico ("Puerto Rican cabotage").   In furtherance of their conspiratorial objectives, said defendants agreed to allocate customers, rig bids to customers, and fix the prices of rates, surcharges and other fees charged to customers, in violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1 and 3, and Section 2 of the Puerto Rico Antitrust Act, 10 LPRA § 258.

2.    As stated in the Memorandum of the United States in Aid of Sentencing in regard to Defendant Peter Baci, The United States government has and is continuing to conduct a lengthy and originally covert investigation regarding the conduct at issue in this litigation.

2

3.     Furthermore, since about February 2008, a federal grand jury sitting in the Middle District of Florida, assisted by the Department of Justice Antitrust Division ("DOJ"), and the Federal Bureau of Investigation ("FBI"), has been investigating, among other things, possible federal antitrust offenses in connection with freight shipments by water between the United Sates and Puerto Rico.  Since April 2008, the DOJ investigation is continuing.

4.     The DOJ investigation has produced direct evidence of the conspiracy which is the subject of this litigation.

5.     To date, five of the six individual Defendants have pled guilty to charges arising from the Department of Justice investigation.  Defendants Peter Baci, Kevin Gill, and Gabriel Serra have pled guilty to "participating in a conspiracy to suppress and eliminate competition in the market of coastal water freight shipments between the United States and Puerto Rico by agreeing to allocate customers; agreeing to rig bids submitted to government and commercial buyers; and agreeing to fix the prices of rates, surcharges and other fees charged to customers; from at least as early as May 2002 and until at least April 2008, in violation of the Sherman Antitrust Act, 15, U.S.C. § 1."

6.     Defendant Gregory Glova has also pled guilty to similar charges but has indicated that he did not join the conspiracy until around December 2005.

3

7.    Defendant Alexander Chisholm, on his part, has pled guilty to "corruptly altering, destroying, and concealing records and documents and attempting to do so with the intent to impair the availability of the records and documents for use in a federal grand jury investigation, in violation of 18 U.S.C. § 1512(c)(1)".

8.    The five individual Defendants who have pled guilty were executives of certain corporate Defendants during the relevant time period.

9.    Meanwhile, the United States government's investigation is ongoing and additional indictments are anticipated.

10.   Because of the unlawful conduct of Horizon, Sea Star, Crowley, Trailer Bridge, Saltchuk, the individual Defendants and their co-conspirators, plaintiffs and other class members artificially paid inflated prices when purchasing retail goods within this District, for personal consumption, that were imported to this District through the Puerto Rican cabotage marketed, offered and/or sold by the Defendants (hereinafter, the imported goods).

## JURISDICTION AND VENUE

11.   This action is instituted under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and costs of suit, including reasonable attorneys' fees, against Defendants Horizon, Sea Star, Crowley, Trailer Bridge, Saltchuk and the individual Defendants for the injuries sustained by plaintiffs

4

and the members of the class by reason of their violations of Sections 1 and 3 of the Sherman Act, 15, U.S.C. §§ 1 and 3.

12.   Subject matter jurisdiction is conferred upon this Court by Sections 4 and 16 of the Clayton Act, 15 U.S.C. § 15(a) and 26, and by 28 U.S. C. § 1331 and 1337.

13.   Venue is proper in this District under Sections 4, 12 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22 and 26, and 28 U.S.C. § 1391(b), (c), and (d).   At least as early as May 2002, and continuing until at least April 2008, one or more of the Defendants resided, maintained offices, transacted business, was found, or had agents in this District, and a substantial part of the events giving rise to plaintiffs' claims occurred, and a substantial portion of the affected interstate trade and commerce described below, has been carried out in this District.

14.   This Court has personal jurisdiction over each Defendant because, among other things, each of them: (a) transacted business throughout the United States, including in this District;  (b) participated in cabotage in the United States, including in this District;  (c) had substantial contact with the United States, including in this District; and/or (d) engaged in an illegal scheme and conspiracy in violation of Section 1 and 3 of the Sherman Act that was directed at and had the intended effect of causing injury to persons and entities residing in, located in, or doing business throughout the United States, including in this District.

5

15. Supplemental jurisdiction is pleaded under section 28 U.S.C. §1367, in order to plea a consumer cause of action under the Consumer Class Action Act of Puerto Rico, Laws of P.R. Ann., Title 32, Sections 3341-3342, to recover for the damages herein sought as a result of Defendants illegal conduct for violating Section 2 of the Puerto Rico Antitrust Act, Laws of P.R. Ann., Title 10, Section 258.

## PARTIES

### Plaintiffs

16. Plaintiffs Francisco Rivera-Muñiz, Valerie Dapena-Disdier and the conjugal partnership constituted by them, have been, at all relevant times, residents of the Commonwealth of Puerto Rico. During the relevant times, they purchased retail goods within this District, for personal consumption, from wholesalers, retailers, and/or distributors (hereinafter, the distributors), who imported the same by means of the cabotage marketed, offered and/or sold by one or more of the Defendants.

17. The prices that the distributors paid for Puerto Rican cabotage to Defendants were, as a result of the conspiracy alleged in this complaint, higher than they otherwise would have been. Consequently, the distributors added such inflated cabotage costs to the final retail price of the imported goods. Therefore, the retail price paid by plaintiffs for the imported goods were, as a result of the conspiracy alleged in this complaint, higher than

they would otherwise have been, and, as a result of the conspiracy, plaintiffs were injured in its persons and property by reason of the antitrust violations pleaded.

## **Defendants**

18.  Defendant Horizon Lines, Inc. ("Horizon Inc.") is a Delaware corporation with its principal place of business in Charlotte, North Carolina.  Its Stock is traded on the New York Stock Exchange.  Is has operated as a holding company for the following wholly-owned subsidiaries: (i) Horizon Lines, LLC: (ii) Horizon Logistics Holdings, LLC; and (iii) Horizon Lines of Puerto Rico, Inc.

19.  Defendant Horizon Lines, LLC ("Horizon LLC") is a Delaware limited liability company with its principal place of business in Charlotte, North Carolina.  It is an ocean carriage containership operating subsidiary of Horizon, Inc.  Horizon LLC operated a fleet of 21 United States-flag containerships and five port terminals linking the continental United States with Puerto Rico, Hawaii, Alaska, Guam and Micronesia.

20.  Defendant Horizon Logistics Holdings, LLC ("Horizon Logistics") is a Delaware limited liability company with its principal place of business in Charlotte, North Carolina.  It is as an ocean carriage management operating subsidiary of Horizon, Inc.

21.  Defendant Horizon Lines of Puerto Rico, Inc. ("Horizon Puerto Rico") is a Delaware corporation with its principal place of

business in San Juan, Puerto Rico.  Horizon Puerto Rico is in the business of ocean shipping and operates a marine terminal in San Juan, Puerto Rico.

22.  Defendants Horizon, Inc., Horizon LLC, Horizon Logistics and Horizon Puerto Rico are collectively referenced in this complaint as "Horizon".  Horizon is the nation's leading domestic ocean shipping and integrated logistics company, accounting for approximately 38 percent of total United States maritime container shipments from the continental United States to Puerto Rico, Hawaii, Alaska, Guam and Micronesia, and approximately 35 percent of the Puerto Rican cabotage market.  Horizon marketed and sold Puerto Rican cabotage in the United States and in this District from at least as early as May 2002, continuing until at least April 2008.

23.  Defendant Gabriel Serra ("Serra") is an individual residing at Calle Washington #2, Condado Princess Apt. 1003, San Juan, Puerto Rico.  During the relevant period, Serra was the Senior Vice President and General Manager for the Puerto Rico division of Horizon Lines, LLC, and was responsible for determining Horizon's pricing for Puerto Rican Cabotage.

24.  Defendant R. Kevin Gill ("Gill") is an individual residing at 7522 Seton House Lane, Charlotte, North Carolina.  From at least as early as May 2002, until December 2005, Gill was the Marketing and Pricing Director for Horizon's Puerto Rico division

and was responsible for determining Horizon's pricing for Puerto Rican cabotage.  From December 2005 until at least April 2008, Gill was Horizon's Vice President of Marketing and was responsible for marketing Horizon's Puerto Rican cabotage services.

25.  Defendant Gregory Glova ("Glova") is an individual residing at 3230 India Wilkes Place, Charlotte, North Carolina. From December 2005 until at least April 2008, Glova was the Marketing and Pricing Director for Horizon's Puerto Rico division and was responsible for determining Horizon's pricing for Puerto Rican cabotage.

26.  Defendant Sea Star Line, LLC ("Sea Star") is a Delaware corporation with its principal place of business in Jacksonville, Florida.  Sea Star is privately held by SaltChuk Resources, Inc. and Taino Star, Inc.  Sea Star provides integrated transportation services to and from the United States, Puerto Rico, the United States Virgin Islands and the Eastern Caribbean islands of Antigua, St. Kitts, St. Maarten and Tortola.  Sea Star accounts for approximately 21 percent of the Puerto Rican cabotage market.  Sea Star marketed and sold Puerto Rican cabotage in the United States and the District from at least as early as May 2002 and continuing until at least as late as April 2008.

27.  Defendant Peter Baci ("Baci") is an individual residing at 4021 Retford Drive, Jacksonville, Florida.  During the relevant period, Baci was the Senior Vice President of Yield Management for

9

Sea Star and was responsible for determining Sea Star's pricing for Puerto Rican cabotage.

28. Defendant Alexander G. Chisholm ("Chisholm") is an individual residing at 2705 Dahlonega Drive, Jacksonville, Florida. During the relevant periods, Chisholm was the Assistant Vice President of Yield Management for Sea Star.

29. Defendant Crowley Maritime Corporation ("Crowley Maritime") is a privately owned Delaware corporation with its principal place of business at 9487 Regency Square Boulevard, Jacksonville, Florida.

30. Defendant Crowley Liner Services, Inc. ("Crowley Liner") is a Delaware corporation with its principal place of business at 9487 Regency Square Boulevard, Jacksonville, Florida. Crowley Liner is a wholly-owned subsidiary of Crowley Maritime. Crowley Liner has operated a fleet of 35 vessels and provides scheduled marine transportation services between the continental United States and ports in the Caribbean and Central America, including ports in Puerto Rico. Crowley Liner has operated at least nine large multi-deck "rolls-on/rolls-off" ("ro/ro") barges that ship goods to and from Puerto Rico.

31. Crowley Maritime and Crowley Liner are collectively referenced in this complaint as "Crowley". Crowley has been in the business of liner services, logistics, energy support, project management, ocean towing and transportation, petroleum and chemical

10

transportation, fuel sales and distributions, ship assist and escort, salvage and emergency response, vessel construction and naval architecture, and ship management. Crowley accounts for approximately 31 percent of the Puerto Rican cabotage market. Crowley marketed and sold cabotage in the United States and in this District from at least as early as May 2002 and continuing until at least April 2008.

32. Defendant Trailer Bridge, Inc. ("Trailer Bridge") is a Delaware corporation with its principal place of business in Jacksonville, Florida. Its stock is publicly traded on the NASDAQ global market. Trailer Bridge offers integrated freight shipping services between the continental United States and Puerto Rico. It has been serving Puerto Rico since 1992 and has accounted for approximately 14 percent of the Puerto Rican cabotage market. Trailer Bridge marketed and sold Puerto Rican cabotage in the United States and in this District from at least as early as May 2002 and continuing until at least April 2008.

33. Defendant Saltchuk Resources, Inc. ("Saltchuk") is a Washington corporation with its principal place of business in Seattle, Washington. Saltchuk, which was incorporated in 1982, is a privately held holding company with approximately sixteen predominately maritime businesses. Saltchuk has a ninety percent equity interest in Sea Star Line.

11

34.   Defendant Leonard Shapiro ("Shapiro") was a founder and is currently a partner in Saltchuk Resources, Inc.  Shapiro is also the Vice President of Pricing for Totem Ocean Trailer Express, another Saltchuk subsidiary.

35.   Defendants Horizon, Sea Star, Crowley, Trailer Bridge and Saltchuk are collectively referred to as "Corporate Defendants".

36.   Defendants Serra, Gill, Glova, Baci, Chisholm, and Shapiro are collectively referred to as "Individual Defendants".

37.   The "corporate Defendants" and the "individual Defendants" are collectively referred to as "Defendants".

## Agents

38.   Whenever in this complaint reference is made to any act, deed or transaction of any Defendant corporation or limited liability company, the allegation means that the corporation or limited liability company engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's or limited liability company's business or affairs.

39.   At all relevant times, each Defendant was an agent of each of the remaining defendants and, in performing the acts alleged in this complaint, was acting within the course and scope of such agency.  Each Defendant ratified or authorized the wrongful acts of each of the other defendants.  Defendants are individually

12

and collectively sued as participants and as aiders and abettors in the improper acts and transactions that are the subject of this action.

## INTERSTATE TRADE AND COMMERCE

40.  The activities of Defendants Horizon, Sea Star, Crowley, Trailer Bridge, Saltchuk, the individual Defendants and their co-conspirators that are the subject of this action were within the flow of, and substantially affected, interstate trade and commerce, including trade and commerce to, from, and within this District.

41.  From at least as early as May 2002, and continuing until at least April 2008, Defendants Horizon, Sea Star, Crowley, Trailer Bridge, Saltchuk, the individual Defendants and their co-conspirators marketed and sold substantial quantities of Puerto Rican cabotage in a continuous and uninterrupted flow of interstate commerce to customers throughout the United States and Puerto Rico.

42.  The market for Puerto Rican cabotage is estimated to be worth many millions of dollars annually.

43.  Defendants and their co-conspirators, and each of them, have used instrumentalities of interstate commerce to market and sell Puerto Rican cabotage.

## THE JONES ACT

44.  The Merchant Marine Act of 1920, 46 U.S.C. § 100, et. seq., commonly referenced as the Jones Act, grants an exclusive privilege to certain United States-flag vessels to engage in ocean

shipping of merchandise or goods to or from United States territories, possessions, or non-contiguous states. This law is restrictive, prohibiting all other vessels, such as foreign-flagged, foreign-built, foreign-crewed, or even foreign-refurbished vessels from engaging in this trade.

45. The purpose of the Jones Act is to protect United States shipping companies. Its restriction on the carriage of domestic ocean cargo to United States-made, United States-flagged, predominately United States-crewed, and United States-owned ships, combines with the relatively small size of these trade routes, results in oligopolistic markets where only a very small number of carriers serve any route.

46. The Jones Act provides no immunity to Defendants for collusion, customer allocation, bid rigging or price fixing (subject to certain inapplicable exemptions), and the conspiracy alleged in this complaint which violates Sections 1 and 3 of the Sherman Act.

## MARKET STRUCTURE

47. Ocean transport is a highly effective method for moving large quantities of non-perishable goods and raw materials. The major commodities shipped through domestic ocean shipping include manufactured goods, farm products, coal, crude petroleum, refined petroleum products and chemicals.

48.   The domestic ocean trade involved in this action if Puerto Rican cabotage, the noncontiguous trade between the continental United States and Puerto Rico.

49.   At all relevant times, Puerto Rican cabotage has been a highly concentrated oligopoly controlled by Defendants Horizon, Sea Star, Crowley and Trailer Bridge.

50.   As described above, Horizon accounts for 35 percent of the Puerto Rican cabotage market; Sea Star accounts for approximately 21 percent of the Puerto Rican cabotage market; Crowley accounts for over 30 percent of the Puerto Rican cabotage market; and Trailer Bridge accounts for approximately 14 percent of the Puerto Rican cabotage market.

51.   This high degree of concentration facilitated the anti-competitive conduct that is alleged here, because it is relatively easy for a limited group of four sellers to reach agreement on customer allocation, bid rigging and prices, and to monitor adherence to such illegal agreement.

## A FUNGIBLE SERVICE

52.   Domestic ocean shipping services within any trade route are highly fungible because carriers offer essentially the same service: transportation of cargo from a specified origin to a destination within a certain time frame.

53.   Absent the alleged conspiracy, purchasers of Puerto Rican cabotage would have selected a carrier based on price, and Horizon,

Sea Star, Crowley and Trailer Bridge would have largely competed on price.

## LACK OF AVAILABLE SUBSTITUTES

54.   There are few or no viable economic substitutes for Puerto Rican cabotage.  Shipping heavy, bulky goods via air-freight is prohibitively expensive.  There are no roads or rail routes between Puerto Rico and the mainland United States.

55.   The lack of viable economic substitutes facilitated the conspiracy that is the subject of this action, because it enabled the Defendants to set supra-competitive prices without fear that customers would switch to other alternatives.

## HIGH ENTRY BARRIERS

56.   There are substantial barriers to entry into the Puerto Rican cabotage market, including: (a) insulation from foreign-flagged, foreign-built, predominately foreign-crewed, and foreign-refurbished vessels; (b) entrenched market positions of the incumbent Defendant shipping companies; (c) a large capital investment and long delivery lead times in building a new container ship in the United States; (d) substantial investment in infrastructure needed to handle container ships; (e) constraints on port space in San Juan, Puerto Rico; (f) high fixed costs relative to variable costs; and (g) need to develop a broad base of customer relationships to realize economies of scale.

57.   There are substantial barriers to entry the facilitated conspiracy that is the subject of this action, because they enabled the Defendants to set supra-competitive prices without fear that new entrants would come into the market, and undercut those prices.

### INELASTIC DEMAND

58.   Demand of Puerto Rican cabotage is inelastic.  Inelastic demand for Puerto Rican cabotage meant that it was profitable for the cartel that is the subject of this action to allocate customers, rig bids and increase prices.

### PRICING COMPONENTS

59.   Charges for cargo transported by ocean carriage are measured in revenue tons.  A revenue ton is the greater of (a) the cubic measures, or (b) the weight of the shipment as packed, both calculated under the metric system.  Other bill of lading charges include receiving charges, bunker fuel charges, intermodal charges, security fees, terminal handling fees, port surcharges, hazard fees, and currency factors.

### GOVERNMENT ANTITRUST INVESTIGATION AND RESULTING GUILTY PLEAS

60.   The United States government has conducted, and continues to conduct, a lengthy covert investigation regarding the conduct of Defendants and their co-conspirators that is at issue in this litigation.

61.   From in or about February 2008 to the present, a grand jury sitting in the Middle District of Florida, assisted by the DOJ

Antitrust Division and the Federal Bureau of Investigation, has been investigating, among other things, possible federal antitrust offenses in connection with freight shipments by water between the mainland of the United States and Puerto Rico.

62. On or about April 17, 2008, agents of the FBI executed search warrants on the premises of each of Defendants Horizon, Sea Star, and Crowley regarding Puerto Rican cabotage.

63. On April 17, 2008 the DOJ disclosed its investigation into the domestic noncontiguous trade ocean shipping industry, and specifically Puerto Rican cabotage.

64. Also on April 17, 2008, Horizon Lines, Inc. issued a press release revealing that it was served with search warrants and a grand jury subpoena in connection with an investigation by the Antitrust Division of the DOJ into the pricing practices of ocean carriers operating in the Puerto Rico trade. Horizon Lines, Inc. also discussed the subpoena in its 10-Q filing dated April 25, 2008. Horizon Lines, Inc. issued another press release on May 28, 2008 announcing that it placed six employees involved in Puerto Rico trade on administrative leave as a result of its review of issues raised by the DOJ's investigation. Horizon Lines, Inc's. 2008 10K contained the following information regarding the DOJ investigation:

> On April 17, 2008, the Company received a grand jury
> subpoena and search warrant from the U.S. District Court
> for the Middle District of Florida seeking information
> regarding an investigation by the Antitrust Division of

18

the Department of Justice (the "DOJ") into possible antitrust violations in the domestic ocean shipping business. Subsequently, the DOJ expanded the time frame covered by the subpoena.

In its 2008 10K, Horizon Lines, Inc. acknowledged that "in connection with the DOJ investigation, it is possible that the Company could suffer criminal prosecution and be required to pay a substantial fine". Horizon Lines, Inc. then explained that "[o]n October 20, 2008, three former managers of the Company plead guilty to a conspiracy to eliminate competition and raise prices for moving freight between the continental U.S. and Puerto Rico. These guilty pleas were accepted by the court on January 20, 2009."

65.  On October 1, 2008, Defendants Baci, Gill, Glova, and Serra were charged by criminal information with one count of conspiracy to suppress and eliminate competition by rigging bids, fixing prices and allocating customers in violation of 15 U.S.C. § 1.

66.  On October 1, 2008, Defendant Chisholm was charged with corruptly altering, destroying, and concealing records and documents and attempting to do so with the intent to impair the availability of the records and documents for use in a federal grand jury investigation in violation of 18 U.S.C. § 1512(c)(1).

67.  On October 20, 2008, Defendant Serra, Senior Vice President and General Manager of Horizon Lines, LLC's Puerto Rico division pled guilty to "participating in a conspiracy to suppress and eliminate competition in the market for coastal water freight

shipments between the United States and Puerto Rico by agreeing to allocate customers; agreeing to rig bids submitted to government and commercial buyers; and agreeing to fix the prices of rates, surcharges and other fees charged to customers; from at least as early as May 2002 and until at least April 2008, in violation of the Sherman Antitrust Act, 15 U.S.C. § 1." Serra is scheduled to be sentenced on April 27, 2009.

68. As set forth in Serra's plea agreement, Serra "participated in a conspiracy with one or more providers of Puerto Rico freight services, a primary purpose of which was to suppress and eliminate competition". During the relevant time, Serra "committed acts in furtherance of the conspiracy, including engaging in discussions and attending meetings with representatives of one or more competing providers of Puerto Rico freight services. During such discussions and meetings, agreements were reached between and among competitors for Puerto Rico freight services to allocate customers, rig bids submitted to government and commercial buyers, and to fix the prices of rates, surcharges and other fees charged to customers..." Serra "was a manager or supervisor in the conspiracy which involved at least five participants and was otherwise extensive". The plea agreement references that during the relevant period, the "sales of Puerto Rico freight services" by the corporation that employed Serra [Horizon} "totaled more than $1 billion".

69.  The criminal information to which Serra pled guilty stated that "[f]or the purpose of forming and carrying out the charged combination and conspiracy, [Serra} and his co-conspirators did those things that they had combined and conspired to do, including, among other things:

> (a)  participated in meetings, conversation, and communications in the United States and elsewhere to discuss customers, rates, and bids for the sale of Puerto Rico freight services;
>
> (b)  Agreed during those meetings, conversations, and communications to allocate customers of Puerto Rico freight services between and among the conspirators;
>
> (c)  agreed during those meetings, conversations, and communications to fix, stabilize, and maintain rates, surcharges, and other fees charged to customers of Puerto Rico freight services;
>
> (d)  agreed during those meetings, conversations, and communications to rig bids submitted to commercial and government customers of Puerto Rico freight services;
>
> (e)  sold Puerto Rico freight services at collusive and noncompetitive prices pursuant to the agreements reached;

21

     (f)   accepted payment for Puerto Rico freight services at collusive and noncompetitive prices;

     (g)   authorized or consented to the participation of subordinate employees in the conspiracy; and

     (h)   concealed the conspiracy and conspiratorial contacts through various means, including private e-mail accounts."

70.  On October 20, 2008 Defendant Gill, who was Marketing and Pricing Director for Horizon's Puerto Rico division from May 2002 until December 2005, and Vice President of marketing beginning in December 2005, likewise pled guilty to "participating in a conspiracy to suppress and eliminate competition in the market for coastal water freight shipments between the United States and Puerto Rico by agreeing to allocate customers; agreeing to rig bids submitted to government and commercial buyers; and agreeing to fix the prices of rates, surcharges and other fees charged to customers; from at least as early as May 2002 and until at least April 2008, in violation of the Sherman Antitrust Act, 15 U.S.C. § 1." Gill is scheduled to be sentenced on April 27, 2009.

71.  As set forth in Gill's plea agreement, Gill "participated in a conspiracy with one or more providers of Puerto Rico freight services, a primary purpose of which was to suppress and eliminate competition". During the relevant times, Gill "committed acts in furtherance of the conspiracy; including engaging in discussions

and attending meetings with representatives of one or more competing providers of Puerto Rico freight services. During such discussions and meetings, agreements were reached between and among competitors for Puerto Rico freight services to allocate customers, rig bids submitted to government and commercial buyers, and to fix the prices of rates, surcharges and other fees charged to customers..." Gil "was a manager or supervisor in the conspiracy which involved at least five participants and was otherwise extensive." The plea agreement states that during the relevant period, the "sales of Puerto Rico freight services" by the agreement states that during the relevant period, the "sales of Puerto Rico freight services" by the corporation that employed Gill [Horizon] "totaled more than $1 billion."

72.  The criminal information to which Gill pled guilty stated that "[f]or the purpose of forming and carrying out the charged combination and conspiracy, [Gil] and his co-conspirators did those things that they combined and conspired to do, including among other things:

> (a)  participated in meeting, conversations, and communications in the United States and elsewhere to discuss customers, rates, and bids for the sale of Puerto Rico freight services;
>
> (b)  agreed during those meetings, conversations, and communications to allocate customers of Puerto Rico

> > freight services between and among the
> > conspirators;
>
> (c) agreed during those meetings, conversations, and
> communications to fix, stabilize, and maintain
> rates, surcharges, and other fees charged to
> customers of Puerto Rico freight services;
>
> (d) agreed during those meetings, conversations, and
> communications to rig bids submitted to commercial
> and government customers of Puerto Rico freight
> services;
>
> (e) sold Puerto Rico freight services at collusive and
> noncompetitive prices pursuant to the agreements
> reached;
>
> (f) accepted payment for Puerto Rico freight services
> at collusive and noncompetitive prices;
>
> (g) authorized or consented to the participation of
> subordinate employees in the conspiracy; and
>
> (h) concealed the conspiracy and conspiratorial
> contacts through various means, including private
> e-mail accounts."

73. Defendant Glova became Marketing and Pricing Director for
Horizon's Puerto Rico division in December 2005. Defendant Glova
likewise pled guilty to "participating in a conspiracy to suppress
and eliminate competition in the market for coastal water freight

shipments between the mainland United States and Puerto Rico by agreeing to allocate customers; agreeing to rig bids submitted to government and commercial buyers; and agreeing to fix the prices of rates, surcharges and other fees charged to customers in violation of the Sherman Antitrust Act, 15 U.S.C. § 1" but indicated that he did not join the conspiracy until around December 2005 when he became the Marketing and Pricing Director.  Glova was scheduled to be sentenced April 27, 2009.

74. As set forth in Glova's plea agreement, Glova "participated in a conspiracy with one or more providers of Puerto Rico freight services, a primary purpose of which was to suppress and eliminate competition".  During the relevant time, Glova "committed acts in furtherance of the conspiracy, including engaging in discussions and attending meeting with representatives of one or more competing providers of Puerto Rico freight services. During such discussions and meeting, agreements were reached between and among competitors for Puerto Rico freight services to allocate customers, rig bids submitted to government and commercial buyers, and to fix the prices of rates, surcharges and other fees charged to customers..." Glova "was a manager or supervisor in the conspiracy which involved at least five participants and was otherwise extensive." The plea agreement states that during the relevant period, the "sales of Puerto Rico freight services by the corporation that employed Glova [Horizon Lines, Inc.] "totaled more

than $1 billion."

75. The criminal information to which Glova pled guilty stated that "[f]or the purpose of forming and carrying out the charged combination and conspiracy, [Glova] and his co-conspirators did those things that they combined and conspired to do, including among other thigs:

     (a)   participated in meetings, conversations, and communications in the United States and elsewhere to discuss customers, rates, and bids for the sale of Puerto Rico freight services;

     (b)   agreed during those meetings, conversations, and communications to allocate customers of Puerto Rico freight services between and among the conspirators;

     (c)   agreed during those meetings, conversations, and communications to fix, stabilize, and maintain rates, surcharges, and other fees charged to customers of Puerto Rico freight services;

     (d)   agreed during those meetings, conversations, and communications to rig bids submitted to commercial and government customers of Puerto Rico freight services;

     (e)   sold Puerto Rico freight services at collusive and noncompetitive prices pursuant to the agreements

                reached;

    (f)   accepted payment for Puerto Rico freight services at collusive and noncompetitive prices;

    (g)   authorized or consented to the participation of subordinate employees in the conspiracy; and

    (h)   concealed the conspiracy and conspiratorial contacts through various means, including private e-mail accounts."

76.  On May 7, 2008, Sea Star issued a press release stating that it was cooperating with the DOJ's investigation and had placed a number of employees on indefinite administrative leave for violations of company policy. Sea Star issued a statement on October 1, 2008 confirming that two former employees agreed to plead guilty for their involvement in the conspiracy and that those two employees had been relieved of their responsibilities on May 5, 2008.

77.  Once the investigation became public, Defendant Baci was approached by government investigators. Although Baci initially took steps to destroy incriminating documents and to otherwise obstruct the investigation, he agreed to cooperate after being presented with conclusive evidence against him, including the existence of documents and tape recordings in the government's possession evidencing his participation in the conspiracy, as well as the fact that several of his co-conspirators were already

cooperating with the government's investigation. (Memorandum of the United States in Aid of Sentencing and Motion for Downward Departure).

78.   On October 20, 2008, Baci, the Senior Vice President of Yield Management for Sea Star, pled guilty to "participating in a conspiracy to suppress and eliminate competition in the market for coastal water freight shipments between the United States and Puerto Rico by agreeing to allocate customers; agreeing to rig bids submitted to government and commercial buyers; and agreeing to fix the prices of rates, surcharges and other fees charged to customers; from at least as early as May 2002 and until at least April 2008, in violation of the Sherman Antitrust Act, 15 U.S.C. § 1."

79.   As set forth in Baci's plea agreement, Baci "participated in a conspiracy with one or more providers of Puerto Rico freight services, a primary purpose of which was to suppress and eliminate competition". During the relevant time, Baci, "committed acts in furtherance of the conspiracy, including engaging in discussions and attending meeting with representatives of one or more competing providers of Puerto Rico freight services. During such discussions and meetings, agreements were reached between and among competitors for Puerto Rico freight services to allocate customers, rig bids submitted to government and commercial buyers, and to fix the prices of rates, surcharges and other fees charged to customers..."

28

Baci "was a manager or supervisor in the conspiracy which involved at least five participants and was otherwise extensive." The plea agreement states that during the relevant period, the "sales of Puerto Rico freight services" by the corporation that employed Baci [Sea Star] "totaled more that $1 billion."

80. The criminal information to which Baci pled guilty stated that "[f]or the purpose of forming and carrying out the charged combination and conspiracy, [Baci] and his co-conspirators did those things that they combined and conspired to do, including among other things:

> (a) participated in meetings, conversations, and communications in the United States and elsewhere to discuss customers, rates, and bids for the sale of Puerto Rico freight services;
>
> (b) agreed during those meetings, conversations, and communications to allocate customers of Puerto Rico freight services between and among the conspirators;
>
> (c) agreed during those meetings, conversations, and communications to fix, stabilize, and maintain rates, surcharges, and other fees charged to customers of Puerto Rico freight services;
>
> (d) agreed during those meetings, conversations, and communications to rig bids submitted to commercial

29

and government customers of Puerto Rico freight services;

(e)   sold Puerto Rico freight services at collusive and noncompetitive prices pursuant to the agreements reached;

(f)   accepted payment for Puerto Rico freight services at collusive and noncompetitive prices;

(g)   authorized or consented to the participation of subordinate employees in the conspiracy; and

(h)   concealed the conspiracy and conspiratorial contacts through various means, including private e-mail accounts."

81.   In Baci's Sentencing Memorandum dated January 26, 2009, Baci made clear the he has been "aware of the entire conspiracy form its inception", that Defendant Shapiro, who "was one of the major shareholders of Saltchuk", "hatched the idea of collusion with the other carriers" and that Sea Star, Horizon, Crowley and Trailer participated in the conspiracy.

82.   As set forth in the Memorandum of the United States in Aid of Sentencing regarding Baci dated January 23, 2009, the "United States believes [Baci] has provides truthful, complete and reliable information." In fact, "[t]he information [Baci] has provided has been corroborated by documents and by information provided by other cooperators and witnesses." Baci's "cooperation

has been useful to the United States in as much as defendant was one of the leaders and organizers of the charged conspiracy and, therefore, has detailed insight regarding the illegal activity of his co-conspirators." "In particular, the information provided by [Baci] has been useful in building cases against co-conspirators who remain to be charged for their roles in the charged conspiracy and other offenses." In this regard, in his Sentencing Memorandum, Baci avers that he may provide valuable assistance to the DOJ's investigation insofar as he has information regarding the antitrust violations committed by Defendants Sea Star, Horizon, Crowley and Trailer Bridge, and also regarding those individuals responsible for supervising and implementing the criminal violations.

83.   On January 30, 2009, Defendant Baci was sentenced to a prison term of 48 months. As stated by the DOJ, such sentence is the longest jail term ever imposed for a single antitrust charge. See Department of Justice Press Release dated January 30, 2009, **Exhibit I**, Judgment was entered on February 5, 2009.

84.   On October 20, 2008, Defendant Chisholm, the Assistant Vice President of Yield Management at Sea Star, pled guilty in the United States District Court to a criminal information stating that, on April 17, 2008, after becoming aware of an investigation by a grand jury sitting in the Middle District of Florida, assisted by the DOJ and the FBI, into possible federal antitrust offenses in Puerto Rican cabotage setting forth that Crhisholm corruptly

31

altered, destroyed, and concealed records and documents and attempted to do so with the intent to impair the availability of the records and documents for use in the investigation in violation of 18 U.S.C. § 1512( c)(1).

85. According to news reports, Crowley's Jacksonville office was likewise raided by the FBI on or about April 18, 2008, in conjunction with the FBI's investigation of anti-competitive conduct in the Puerto Rican Cabotage market.

86. On May 15, 2008, Trailer Bridge filed its Form 10-Q in which it admitted that is had been served with a subpoena from the DOJ seeking documents and information relating to a grand jury investigation of unlawful pricing practices among Puerto Rico ocean carriers. Trailer Bridge's August 14, 2008 Form 10-Q stated that Trailer Bridge made several document submissions to the government in response to the subpoena.

87. According to publications such as <u>Jasksonville Business Journal, American Shipper and San Francisco Business Times</u>, John D. McCown who had served as Chief Executive Officer of Trailer Bridge since November 1995, has recently resigned as CEO of the company.

## **DEFENDANTS' CONSPIRACY AND ANTI-COMPETITIVE BEHAVIOR**

88. Beginning at least as early as May 2002, and continuing until at least April 2008, Defendants Horizon, Sea Star, Crowley, Trailer Bridge, Saltchuk, the individual Defendants and their co-conspirators engaged in a continuing agreement, understanding and

conspiracy in restraint of trade to restrict competition by allocating customers, rigging bids, and fixing the prices of rates, surcharges and other fees for Puerto Rican cabotage.

89. As the government has indicated, at least one of the meetings in furtherance of the conspiracy took place in Florida. Upon information and belief, multiple meetings and/or conversations in furtherance of the conspiracy took place in Puerto Rico and in Florida.

90. Defendant Baci in his Sentencing Memorandum specifically identifies Defendants Sea Star, Horizon, Crowley and Trailer Bridge as the companies involved in this conspiracy.

91. As set forth in Baci's Sentencing Memorandum, Defendant Shapiro, a principal in Defendant Saltchuk, "hatched the idea of collusion with the other carriers." While Shapiro was not an officer of Sea Star, he inserted himself into the operations of Sea Star and, as one of the principals of Saltchuk, he nonetheless wielded significant authority which he used to intimidate Sea Star employees, including Baci. (Peter Baci's Sentencing Memorandum dated January 26, 2009, p.8).

92. After Defendant Shapiro and Serra reached an agreement regarding the conspiracy, Shapiro ordered Baci, the Senior Vice President of Yield Management for Sea Star, to work with Gill, the Marketing and Pricing Director for Horizon and later Glova, Gill's replacement, in implementing the agreement.

93.    Each of the individual Defendants other than Shapiro has pled guilty to unlawful conduct in furtherance of the conspiracy.

94.    The government's investigation is ongoing and additional indictments are anticipated.

95.    As the government acknowledged in its Sentencing Memorandum, Baci was one of the leaders and organizers of the charged conspiracy who had detailed insight regarding the illegal activity of his co-conspirators including information that has assisted the government in building its case against those co-conspirators who remain to be charged for the roles in the conspiracy and other offenses.

96.    Baci confirmed in his Sentencing Memorandum that he was a participant in the illegal agreement from its inception.

97.    During two interviews with the government, Baci incriminated himself and his co-conspirators, and explained the significance and context of documents he prepared during and in furtherance of the conspiracy.

98.    In fact, Baci maintained "contemporaneous notes" throughout the unlawful conspiracy.

99.    In addition to Baci's notebooks regarding the facts of the conspiracy, Baci has "an enormous collection of emails substantiating the conspiracy."

100.   According to Baci, detailed additional information also exists regarding meetings and travel which will further

substantiate the conspiracy.

101.   The United States, in its Memorandum makes clear that it finds Baci and his information credible and useful and expects it to substantiate charges against others.

## PARALLEL PRICING AND OTHER CONDUCT

102.   The conspiracy was conceived and implemented in order to take full advantage of a significant shift in the market concentration caused by the bankruptcy of Navieras NPR ("Navieras"), one of the key participants in the market for Puerto Rican cabotage.

103.   Navieras filed for bankruptcy in 2001 and thereafter ceased operations.  As Defendant Trailer Bridge has previously explained, "From 1998 until 2002, the sustained volume-driven business strategy of Navieras, the then-largest operator in the market, had led to a poor pricing environment and low capacity utilization."  As a result of Navieras' exit from the market, the market for shipping services between the mainland United States and Puerto Rico became even more concentrated.  The concentration of the market following Navieras' exit created the conditions that gave rise to the conspiracy alleged herein.

104.   Defendants Horizon, Sea Star, Crowlwy, Trailer Bridge, Saltchuk, the individual Defendants and their co-conspirators launched their conspiracy in or about May 2002 following Naviera's exit from the market.

105.   Prior to April 2002, Puerto Rican cabotage had operated at overcapacity.   Despite a nearly 14% increase in the number of containers shipped on Puerto Rican trade routes from 1994 through approximately 2003, freight rates for shipping between the United Sates mainland and Puerto Rico declined by 30% due to excess supply.

106.   From May 2002 through April 2008, capacity for Puerto Rico cabotage remained flat, but since approximately 2003, rates surcharges and fees have increased dramatically and nearly simultaneously across Defendant suppliers.

107.   Since at least early 2006, the Puerto Rican economy has experienced an economic downturn, and, throughout 2007, it was in a recession.   As a result of these economic conditions, there was a significant and substantial softening of consumer demand and a corresponding decrease in the volume of goods transported to Puerto Rico from the United States mainland.   Despite weak economic conditions, softening demand and increasing overcapacity, Defendants Horizon, Sea Star, Crowley and Trailer Bridge increased their rates by approximately 9% directly contrary to what should occur in a competitive market.

108.   Defendant shipping lines also increased rates to supra. competitive levels by, among other things, agreeing to carry each other's shipping containers when demand outstripped one Defendant shipping line's supply capacity.   Absent this agreement, Defendant

shipping lines would have bid against each other for such business.

109. For example, before Navieras filed its bankruptcy petition, it had provided shipping services out of ports in Houston, Texas and Elizabeth, New Jersey. After Sea Star acquired Naviera's vessels in Naviera's bankruptcy proceeding, Sea Star discontinued the service out of Houston and Elizabeth. Instead, Sea Star shipped containers on Horizon vessels out of those two ports.

110. By May 2003, Defendants Horizon, Sea Star, Crowley and Trailer Bridge had harmonized their bunker fuel surcharge at approximately $225 per container, even through fuel cost, a percentage of operating cost (per shipped-unit), and fuel efficiency varied across these Defendants. Despite Defendant's differing cost structures, Defendants Horizon, Sea Star, Crowley and Trailer Bridge all provide similar services and their increased surcharges were not driven by legitimate economic considerations.

111. In mid-March 2005, Defendants Horizon, Sea Star, Crowley and Trailer Bridge uniformly imposed bunker fuel surcharges of approximately $280 per container effective during the first week of April 2005. In mid-April 2005, each again uniformly increased the bunker fuel surcharge to approximately $310 per container.

112. At the end of June 2005, Defendants Horizon, Sea Star, Crowley and Trailer Bridge increased the bunker fuel surcharge by approximately $15 per container, effective the end of July and

beginning of September, respectively, and defendants Horizon and Sea Star imposed approximately $15 increases in August, effective at the beginning of September 2006.

113. At the end of July 2006, Defendants Crowley and Trailer Bridge uniformly increased their bunker fuel surcharge by approximately $15 per container, effective the end of July and beginning of September, respectively, and defendants Horizon and Sea Star imposed approximately $15 increases in August, effective at the beginning of September 2006.

114. Effective in mid-May 2007, each of Defendants Horizon, Sea Star, Crowley and Trailer Bridge uniformly increased bunker fuel surcharges by approximately $25 per container.

115. Since 2002, Defendants Horizon, Sea Star, Crowley and Trailer Bridge have changed bunker fuel surcharges, often with only a few days' notice; and the fuel surcharges to plaintiffs and the class have been increased nearly simultaneously in almost the same amounts by each of Horizon, Sea Star, Crowley and Trailer Bridge.

116. The increases in the bunker fuel surcharges are not supported by increases in the cost of bunker fuel.  In fact, the impositions of bunker fuel surcharges per container or per vehicle bears virtually no relation to increases in the costs of fuel because any increase in the cost of fuel consumed is largely independent of the number of containers or vehicles transported.

117. Instead, the imposition of increased bunker fuel surcharges resulted in profits for Defendant shipping lines that increased in lock step with their increased bunker fuel surcharges.

118. As reported in the *Journal of Commerce* on January 22, 2007, container volumes for Puerto Rican cabotage decreased between 8% and 12% in 2006; yet, freight rates, including surcharges and fees, increased an average of 5%. In the third quarter of 2006, Trailer Bridge reported earnings of $1.9 million, an increase over the same period in 2005. On March 5, 2007, *Marine Log* quoted John D. McCrown, Chairman and CEO of Trailer Bridge as saying, "These are the best quarterly financial results that Trailer Bridge has reported in its history". As the article makes clear, the increase in earnings was due in part to increased rates, including fuel surcharges.

119. Defendants Horizon, Sea Star, Crowley and Trailer Bridge not only insulated themselves from rising fuel costs, but, through their bunker fuel surcharges, increased profit margins in a declining market, directly contrary to what would occur in a competitive market.

120. Effective at the beginning of April 2003, each of defendants Horizon, Sea Star, Crowley and Trailer Bridge imposed a security fee per container, where they had not done so previously, except for Trailer Bridge. The simultaneous imposition of a security fee cannot be explained by increased cost.

121. Similarly, effective in February and March 2003, each of Defendants Horizon, Sea Star and Trailer Bridge imposed an approximately $40 per container terminal handling charge, where they had not done so previously, except for Sea Star. The imposition of the terminal handling charge cannot be explained by increased costs.

122. Defendants Horizon, Sea Star, Crowley and Trailer Bridge have participated in trade association activities that fostered the conspiracy that is the subject of this action. Horizon, Sea Star, Crowley and Trailer Bridge have all been members of the Maritime Cabotage Task Force ("MCTF"), which was founded on September 27, 1995, to protect the United States maritime cabotage laws. The MCTS's Board of Directors has included Chuck Raymond and Robert Zuckerman of Horizon and Michael Roberts of Crowley.

123. Defendants had ready access to industry data that facilitated efficiently monitoring the conspiracy. The Port Import Export Reporting Service ("PIERS") collects and distributes, for a fee, data for the maritime industry, including container size and quantity, cargo quantity and unit of measure, and cargo weight and volume. This type of information allowed Defendants to monitor their conspiracy and to verify its success.

124. In forming and effectuating their contract, combination or conspiracy, Defendants Horizon, Sea Star, Crowley and Trailer Bridge, Saltchuk, the individual Defendants and their co-

conspirators did those things that they unlawfully combined and conspired to do, including among other things:

        a.   agreeing to allocate customers of Puerto Rican cabotage;

        b.   rigging bids to customers for Puerto Rican cabotage;

        c.   fixing rates, surcharges and other fees for Puerto Rican cabotage;

        d.   marketing and selling Puerto Rican cabotage at agreed-upon prices;

        e.   exchanging information on customers, bids, rates, surcharges, fees, volumes and capacity; and

        f.   implementing and monitoring the arrangements among cartel members.

125.    Defendants Horizon, Sea Star, Crowley, Trailer Bridge, Saltchuk, the individual Defendants and their co-conspirators engaged in the above conduct to facilitate their unlawful agreements concerning customer allocation, bid rigging, price fixing and other anticompetitive conduct concerning Puerto Rican cabotage.

### ANTITRUST INJURY

126. Defendants' conspiracy was inimical to the competitive process regarding all consumers' good shipped by means of the

Puerto Rican cabotage, resulting in injury and financial damages to plaintiffs, in amounts that are presently undetermined. See Department of Justice Press Releases dated October 1, 2008 and January 30, 2009.

127. The conspiracy between Defendants Horizon, Sea Star, Crowley, Trailer Bridge, Saltchuk, the individual Defendants and their co-conspirators injured plaintiffs and class members in a substantially similar manner by eliminating, suppressing and reducing price competition in Puerto Rican cabotage, which had the effect of raising, maintaining or otherwise stabilizing prices for Puerto Rican cabotage at a supra-competitive level.

128. Because prices for Puerto Rican cabotage were fixed at, maintained at, or increased to a level above where they otherwise would have been in a competitive market, from at least as early as May 2002 continuing until at least April 2008, the distributors paid higher prices for Puerto Rican cabotage than they would have paid had Defendants Horizon, Sea Star, Crowley, Trailer Bridge, Saltchuk, the individual Defendants and their co-conspirators not conspired to violate the antitrust law.

129. Consequently, the distributors added such inflated cabotage costs to the final retail price of the imported goods. Therefore, the retail price paid by the plaintiffs for the imported goods were, as a result of the conspiracy alleged in this complaint, higher than they would otherwise have been.

130. Paying extremely elevated retail prices for the imported goods, that were increased due to the addition by the distributors of the inflated cabotage costs illegally fixed by the Defendants, is the type of injury the antitrust laws were designed to prevent.

## FRAUDULENT CONCEALMENT

131. From 2002 through April 2008, Defendants Horizon, Sea Star, Crowlwy, Trailer Bridge. Saltchuk, the individual Defendants and their co-conspirators have affirmatively and wrongfully concealed their unlawful conduct from plaintiffs and the class.

132. The conspiracy that is the subject of this action was fraudulently and wrongfully concealed by Defendants Horizon, Sea Star, Crowley, Trailer Bridge, Saltchuk and the individual defendants by various means and methods, including, but not limited to: (a) secret meetings; (b) misrepresentations to their Puerto Rican cabotage customers concerning the reasons for increases in rates, surcharges and other fees; and ( c ) surreptitious communications among defendants by the use of the telephone or in-person meetings and through private e-mail accounts in order to limit the existence of written records, minimize access to any written records, and conceal from non-conspirators the existence and nature of their discussions regarding customer allocation, bid rigging, and price fixing.

133. The criminal charges to which Defendants Baci, Gill, Glova and Serra have pled guilty specifically indicate that the

various means by which these Defendants "concealed the conspiracy and conspiratorial contacts... include[ed] private e-mail accounts." In fact, once Baci became aware of the investigation, he immediately called with directions to "shut down the email". Defendant Chrisholm has pled guilty to "corruptly alter[ing], destroy[ing], and conceal[ing] records and documents" relevant to the grand jury's investigation of antitrust violations in the Puerto Rican cabotage industry.

134. Defendants Horizon, Sea Star, Crowley, Trailer Bridge, Saltchuk, the individual Defendants and their co-conspirators met and communicated secretly concerning customers, bid rigging, rates, surcharges and other fees so as to avoid detection and agreed among themselves not to discuss publicly or otherwise reveal the nature and substance of the acts and communications in furtherance of their illegal conspiracy.

135. Defendants' public statements about the reasons for rate and surcharge increases and inability to influence prices for Puerto Rican cabotage were materially false and misleading and made for the purpose of concealing Defendants's anti-competitive scheme.

136. In 2004, for example, Trailer Bridge's CEO John McCown stated in an interview that customer decisions were driven by "[p]rice in an all-inclusive sense, which starts with the freight rate," implying that Defendants could not anti-competitively rig bids or set and increase rates, surcharges or fees, and therefore

were not doing so.

137. The plaintiffs did not discover the existence of the conspiracy that is the subject matter of this complaint until October 20, 2008, when it was publicly disclosed that the individual Defendants pled guilty for the antitrust violations.

138. As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been equitably tolled as to any claims of plaintiffs or members of the class arising from Defendants' anti-competitive conduct that is the subject matter of this complaint.

## CLASS ACTION ALLEGATIONS

139. Plaintiffs bring this action on behalf of themselves and as a class action under the provisions of Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all members of the following class:

> All consumers in Puerto Rico (excluding governmental entities, Defendants, co-conspirators, and the present and former parents, predecessors, subsidiaries and affiliates of the foregoing) <u>who purchased, for personal consumption, the goods carried by means of the Puerto Rican cabotage serviced by the Defendants or their co-conspirators, or any present or former parent, subsidiary or affiliate thereof , at any time during the period from at least May 1, 2002, until April 17, 2008</u>.

140. Plaintiffs reasonably believe that there are hundreds thousands or millions of class members.

141. The class is so numerous and geographically dispersed that joinder of all members is impracticable.

142. Plaintiffs are members of the class, which claims are typical of the claims of the class members, and plaintiffs will fairly and adequately protect the interests of the members of the class.

143. Plaintiffs are the ultimately direct purchasers of consumer goods that were brought to Puerto Rico by the above mentioned Puerto Rican cabotage, and their interests are coincident with, and not antagonistic to, those of the other members of the class. In addition, plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

144. There are questions of law and fact common to the class, which predominate over any questions affecting only individual members of the class, including legal and factual issues relating to liability and damages. The questions common to the class relate to the existence of the conspiracy alleged, the type and common pattern of injury sustained as a result thereof, and the appropriate remedies, but no limited to:

        a. whether Defendants Horizon, Sea Star, Crowley, Trailer Bridge, Saltchuk and the individual Defendants engaged in a combination or conspiracy to allocate customers, rig bids, and fix the prices

of rates, surcharges and other fees for Puerto Rican cabotage;

b.    the identity of the participants in the conspiracy;

c.    the duration of the conspiracy that is the subject of this complaint and the nature and character of the acts performed by Defendants Horizon, Sea Star, Crowley, Trailer Bridge, Saltchuk, the individual Defendants and their co-conspirators in furtherance of the conspiracy;

d.    whether the conspiracy that is the subject of this action violated Sections 1 and 3 of the Sherman Act and Puerto Rico Statutes Title 10 Section 258;

e.    whether the conduct of Defendants Horizon, Sea Star, Crowley, Trailer Bridge, Saltchuk, the individual Defendants and their co-conspirators, as alleged in this complaint, caused injury to the patrimony and property of plaintiffs and other members of the class;

f.    the effect of Defendants' conspiracy on the prices of Puerto Rican cabotage during the time from at least May 1, 2002, until April 17, 2008;

g.    the effect of the cabotage price increases in the final retail price of the imported goods, during the time from at least May 1, 2002, until April 17,

2008.

    h.    The appropriate measure of damages sustained by plaintiffs and other members of the class; and

    i.    whether Defendants Horizon, Sea Star, Crowley, Trailer Bridge, Saltchuk and the individual Defendants undertook actions to wrongfully conceal the unlawful conspiracy that is the subject of this action.

145. The prosecution of separate actions by individual members of the class would create a risk of inconsistent or varying adjudications.

146. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Prosecution as a class action will eliminate the possibility of repetitious litigations.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently and without duplication of effort and expense that numerous individual actions would engender.  Class treatment will also permit the adjudication of relatively small claims by many class members who otherwise could not afford to litigate an antitrust claim such as is asserted in this complaint.  This class action presents no difficulties of management that would preclude its maintenance as a class action.

**CLAIMS**

## COUNT 1 - Unlawful Conspiracy for Price Setting in Violation of Sherman Act § 1, 15 U.S.C. § 1

147. Plaintiffs incorporate by reference as if fully set forth the allegations in Paragraphs 1 through 146 of this complaint.

148. Beginning at least as early as May 2002 and continuing until April, 17 2008, Defendants Horizon, Sea Star, Crowley, Trailer Bridge, Saltchuk, the individual Defendants and their co-conspirators, by and through their officers, directors, employees, agents, or other representatives, entered into a continuing agreement, understanding and conspiracy in restraint of trade to restrict competition by allocating customers, rigging bids, and fixing the prices of rates, surcharges and other fees for Puerto Rican cabotage in violation of Section 1 of the Sherman Acts, 15 U.S.C. § 1.

149. Defendants' unlawful conduct resulted in artificially high, supra-competitive prices, charged by them and their co-conspirators for Puerto Rican cabotage, and paid in last instance by plaintiffs and the rest of the members of the class for most of the goods purchased in Puerto Rico.

150. Plaintiffs and members of the class paid more for consumer goods sold in Puerto Rico than they would have paid in a competitive market, unfettered by Defendants' and their co-conspirators' unlawful anti-competitive activities.

151. Plaintiffs and members of the class seek to recover three times their overcharge damages, plus interest, attorneys' fees and costs of litigation.

## COUNT II - Unlawful Price Setting in Violation of Sherman Act. § 3, 15 U.S.C. § 3

152. Plaintiffs incorporate by reference as if fully set forth the allegations in Paragraphs 1 through 151 of this complaint.

153. Beginning at least as early as May 2002, and continuing until April 17, 2008, Defendants Horizon, Sea Star, Crowley, Trailer Bridge, Saltchuk, the individual Defendants and their co-conspirators, by and through their officers, directors, employees, agents, or other representatives, entered into a continuing agreement, understanding and conspiracy in restraint of trade to restrict competition by allocating customers, rigging bids, and fixing the prices of rates, surcharges and other fees for Puerto Rican cabotage in violation of section 3 of the Sherman Act, 15 U.S.C. § 3.

154. Defendants' unlawful conduct resulted in artificially high, supra-competitive prices, charged by them and their co-conspirators for Puerto Rican cabotage, and ultimately paid by plaintiffs and all the other members of the class for most of the goods purchased in Puerto Rico.

155. Plaintiffs and members of the class paid more for the consumer goods bought by them than they would have paid in a competitive market unfettered by Defendants' and their co-conspirators' unlawful anti-competitive activities.

156. Plaintiffs and members of the class seek to recover three times their overcharge damages plus interests, attorneys' fees and costs of litigation.

## COUNT III - Violation of Puerto Rico Statutes Title 10 Section 258 et seq.

157. Plaintiffs incorporate by reference as if fully set forth the allegations in Paragraphs 1 through 156 of this complaint.

158. Beginning at least as early as May 2002, and continuing until April 17, 2008, Defendants Horizon, Sea Star, Crowley, Trailer Bridge, Saltchuk, the individual Defendants and their co-conspirators, by and through their officers, directors, employees, agents, or other representatives, entered into a continuing agreement, understanding and conspiracy in restraint of trade to restrict competition by allocating customers, rigging bids, and fixing the prices of rates, surcharges and other fees for Puerto Rican cabotage in violation of Puerto Rico Statutes Title 10 Section 258.

159. Defendants' unlawful conduct resulted in artificially high, supra-competitive prices, charged by them and their co-conspirators for Puerto Rican cabotage, and ultimately paid by

plaintiffs and the other members of the class for most of the goods purchased in Puerto Rico.

160. Plaintiffs and the rest of the members of the class paid more for consumer goods sold in Puerto Rico than they would have paid in a competitive market unfettered by Defendants' and their co-conspirators' unlawful anti-competitive activities.

161. Pursuant to Puerto Rico Statutes Title 10 Section 268, Plaintiffs and members of the class seek to recover three times their overcharge damages plus interests, attorneys' fees and costs of litigation, plus a reasonable amount "not less than twenty-five percent (25%) for attorneys fees" as mandated by section 3343 of the Consumer Class Action, P.R. Laws Ann. tit. 32.

162.  The Court shall also ordered the creation of a "Trust Fund" wherein the amounts recovered by the plaintiffs on behalf of the consumers unnamed or undetermined in this class suit shall be deposited.  See §§ 1016-1017 of PR Laws Ann. tit. 23 (Consumer Service Administration).

<u>**JURY TRIAL DEMAND**</u>

Pursuant to Federal Rule of Civil Procedure 38(b), plaintiffs demand a trial by jury of all issues asserted in this complaint so triable.

<u>**RELIEF SOUGHT**</u>

**WHEREFORE,** plaintiffs seek judgment that:

A.   The Court determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure;

B.   The contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators, be adjudged to have been in violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1 and 3, and Puerto Rico Statutes Title 10 Section 258 (Puerto Rico Antitrust Law);

C.   Judgment be entered for plaintiffs and all other members of the class against Defendants, jointly and severally, for three times the amount of damages sustained by plaintiffs and all other members of the class, as allowed by law, together with the costs of this action, including reasonable attorneys' fees; and

D.   Plaintiffs and members of the class have such other, further and different relief as the case may require and the court may deem just and proper under the circumstances.

RESPECTFULLY SUBMITTED.

In San Juan, Puerto Rico, this 19th. day of October, 2009.

s/José A. Andréu-García
José A. Andréu García/ USCD-PR 110304
Attorney for Plaintiffs
Andreu & Sagardia Law Firm
261 Domenech Ave.
San Juan, Puerto Rico 00918
Tel. (787) 754-1777 / 763-8044
Fax. (787) 763-8045
jaf@andreu-sagardia.com

53